No. 2--05--0624

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| In re M.C. and T.C., Minors | ) | Appeal from the Circuit Court |
| | ) | of Kendall County. |
| | ) | |
| | ) | Nos. 01--JA--03 |
| | ) | 02--JA--11 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner-) | | James M. Wilson, |
| Appellee, v. Terri B., Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the opinion of the court:

Respondent, Terri B., appeals from the trial court's order terminating her parental rights to her children, T.C. and M.C. We affirm.

In 2001, T.C. was adjudicated neglected, made a ward of the court, and placed in the custody of the Department of Children and Family Services (DCFS). M.C., who was born in April 2002, was adjudicated neglected, made a ward of the court, and placed in the custody of DCFS in October 2002. Temporary guardianship of the minors was placed with Philip B., their maternal grandfather residing in Oswego, Illinois.

In July 2003, the State filed a petition to terminate the parental rights of Terri and the minors' father, Michael C. Michael surrendered his parental rights in June 2004 and is not party to this appeal. The cases transferred back and forth between De Kalb and Kendall

Counties without any disposition of the petition as to Terri's parental rights. On March 8, 2005, the Kendall County State's Attorney's office filed a new petition to terminate Terri's parental rights. Following a hearing in June 2005, the court found Terri to be an unfit person to have a child, pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2004)), in that she failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare by failing to financially support the minors or maintain contact with them. The court subsequently found that it was in the minors' best interests that Terri's parental rights be terminated and DCFS be continued as legal guardian and custodian with power to consent to the minors' adoption. This appeal followed.

Terri now contends that the trial court erred in finding that she was an unfit parent. A trial court's findings of unfitness will be reversed only if they are against the manifest weight of the evidence. In re Adoption of Syck, 138 Ill. 2d 255, 274 (1990).

The only witness at the hearing on parental fitness was Laurel Dutton, the foster care caseworker for T.C. and M.C. for almost four years. Dutton testified that Terri had "participated in service[s] sporadically" since 2001. Terri had satisfactorily completed only two of the eight six-month service plans that had been established for her. In Dutton's opinion, Terri had not maintained a reasonable degree of interest, concern, or responsibility for the welfare of her children. Terri saw the children "every time" that she had been in town for court dates "during the past few weeks," but she made no other efforts to contact them during that period. Terri was currently participating in treatment for drug abuse and had been since October 2004. This was Terri's second time in inpatient treatment, and she had also been involved in prior outpatient treatment.

On cross-examination, Dutton testified that Terri had been involved in inpatient drug treatment in 2000 or 2001. Dutton was unsure if Terri had been successfully discharged, because Dutton "just received the case at that time." Terri received outpatient treatment for two periods in 2002. In the first instance, Dutton was told that Terri "wasn't cooperating or attending consistently" and did not satisfactorily complete the program. Later that year, Terri attended another course of outpatient treatment but was unsatisfactorily discharged when she "went out of contact [and] withdrew from services" after several months. Terri's most recent treatment was in Peoria, Illinois. She completed the inpatient program in January 2005 and was currently in the after-care program, living in a shelter in Peoria. Dutton believed that Terri was currently employed. Terri was in the drug treatment program at the request of DCFS. When Dutton was asked whether Terri was able to see the children while she was in treatment, the following colloquy took place:

"A [Dutton]. She was able to. Her father would have driven the children down there.

Q. Did she?

A. I don't know how many times. I know that there were times that he had offered to drive them down and she opted not to. She has seen them but it hasn't been on a regular basis.

Q. But she did see them while she was there?

A. Yes.

Q. And when did she get out of there?

A. She finished inpatient in January of this year.

Q. And what are the terms of her visitation?

A. Our policy is that she's entitled to one visit a month, but her family is willing to do visits more often if she wants to.

Q. Okay. And since January of 2005, how often has she visited them?

A. Umm, as I said, she's generally visited when she comes for court dates. So I would say roughly five times.

Q. Okay. So that would be pretty much in accordance with your once-a-month policy; is that correct?

A. Yes.

Q. And do you know if she visited any other times when her father took the kids down?

A. No, he hasn't taken them down there recently."

Terri was participating in counseling and cooperating with her drug treatment, but Dutton was concerned that Terri had made progress the last time a termination petition was filed, only to relapse before the children could be returned to her. Dutton was also concerned that T.C. had been in foster care for almost five years and that M.C. had been in foster care for almost his entire three-year life. Even with Terri's current cooperation, Dutton did not think that "she's any closer to return home now than she was a year ago."

Under questioning from the court, Dutton testified that Terri had made no efforts to visit the children in the past several months other than on court dates. Terri had not called the children or sent any cards or letters in the past few months and had missed M.C.'s April birthday. Terri had not made any financial support payments for the children, nor did she have any involvement with T.C.'s schooling.

In determining whether a parent has shown reasonable concern, interest, or responsibility as to her children, we examine the parent's conduct concerning the children in the context of the circumstances in which the conduct occurred. Syck, 138 Ill. 2d at 278. In considering a parent's failure to personally visit her children as evidence of a lack of interest or concern, we may look to the parent's difficulty in obtaining transportation, the parent's poverty, the actions or statements of others that hinder or discourage visitation, and whether the parent's failure to visit was motivated by a need to cope with other aspects of her life or by true indifference to and lack of concern for the children. Syck, 138 Ill. 2d at 278-79. Letters, telephone calls, and gifts to the children or those caring for the children may demonstrate reasonable concern, interest, and responsibility, depending on the content, tone, and frequency of the contacts. Syck, 138 Ill. 2d at 279. It is the parent's efforts to communicate with and show interest in the children, not the success of the efforts, that must be examined. Syck, 138 Ill. 2d at 279.

We find no error in this case. The evidence showed that Terri visited her children only five times in five months. While once-a-month visitation was the minimum visitation to which she was entitled, she had the opportunity for more visitation, which she refused. Furthermore, the five visits coincided with court dates, thereby showing a lack of enthusiasm or commitment on her part; no special effort was made to visit the children, as her attendance was already required by the court. We note that Terri had undergone treatment and was still living in Peoria, while the children lived in Oswego. While this distance is estimable, neither transportation nor poverty prevented visitation, as Terri's father offered to drive the children down for visits. No one discouraged additional visitation, and more was offered, but Terri refused to take advantage of the offer. She also failed to

keep contact with the children through cards or telephone calls, even neglecting to call or send a gift for M.C.'s birthday two months before the hearing. Terri made no reasonable efforts to communicate with, show interest in, or financially support her children, and we conclude that the trial court's finding that Terri was an unfit parent was not against the manifest weight of the evidence.

Terri does not raise any contention regarding the trial court's finding that it is in the best interests of the children that her parental rights be terminated.

For these reasons, the judgment of the circuit court of Kendall County is affirmed.

Affirmed.

KAPALA, J., concurs.

JUSTICE BOWMAN, dissenting:

I respectfully dissent. A biological parent has a fundamental liberty interest in raising his or her own child. In re Gwynne P., 215 Ill. 2d 340, 353 (2005). Thus, under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2004)), the State has the burden of proving by clear and convincing evidence that the parent is unfit before the trial court may terminate parental rights. In re G.W., 357 Ill. App. 3d 1058, 1060 (2005). Contrary to the majority, I believe that the trial court's ruling that the State met its burden is contrary to the manifest weight of the evidence.

The trial court found that Terri was unfit on the ground that she failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare, in that she did not financially support the children or maintain sufficient contact with them. The only witness to testify during the parental fitness hearing was a foster care caseworker, Laurel Dutton. Dutton testified that Terri had completed an inpatient drug treatment

program in January 2005, and that she was currently in an outpatient program and believed to be employed. Terri's most recent drug tests were negative. Dutton also testified that Terri had visited the children about five times since January 2005, corresponding with court dates.

The majority believes that these visitations were not significant because Terri's "attendance was already required by the court." Slip op. at 5. However, visitation with the children was not mandated by the court, and I would not hold it against Terri that she efficiently scheduled visitations when she was in Kendall County for court. This is especially true given that Terri was living and working in Peoria, a considerable distance away, and that the children were in the care of Terri's father, presumably a person whom Terri trusted. I also think that Terri's failures to supplement these visits with calls, cards, or letters is not of exceptional importance given that at the time of the hearing, T.C. was not yet seven years old and M.C. was only three years old.

Additionally, although Dutton testified that Terri did not take advantage of every opportunity to visit the children, Dutton responded "I don't know how many times" when asked how often Terri had her father bring the children to visit her in drug treatment. Also, as the majority recognizes, the court should consider whether the parent's failure to visit a child was motivated by a need to cope with personal problems rather than an indifference or lack of concern for the child. In re Adoption of Syck, 138 Ill. 2d 255, 279 (1990). Given Terri's participation in drug treatment, I do not believe that her choice to not engage in every possible visitation with the children constitutes clear and convincing evidence of a lack of interest or concern for them. See also In re F.S., 322 Ill. App. 3d 486, 497 (2001) (mother's enrollment in drug treatment program explained some missed visits with her

No. 2--05--0624

child).  Finally, while the trial court found that Terri had also failed to financially support the children, the State presented no evidence that she was in a position to provide such support.

In my opinion, it is clearly evident that the State did not meet its burden of presenting clear and convincing evidence that Terri failed to maintain a reasonable degree of interest, concern, or responsibility as to her children's welfare.  Therefore, I would reverse the trial court's orders declaring Terri to be unfit and terminating her parental rights.